IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

NATE A. LINDELL,

            Plaintiff

v.

CATHY JESS, GARY BOUGHTON,
LEBBEUS BROWN, C.O. SHAWN GALLINGER,
MARK KARTMAN, JOHN DOES 1 AND 2,
JEAN LUTSEY, A.C.P., SUSAN L. PETERS, R.N.
MARY H. ALSTEEN, A.C.P., LESLIE A. MATHEWSON,
PSYCHOLOGISTS TODD L. HAMILTON,
and L. ADAMS,

            Defendants.

OPINION AND ORDER

Case No. 18-cv-895-slc
_____

*Pro se* plaintiff Nate A. Lindell has filed this lawsuit under 42 U.S.C. § 1983, contending that the defendants violated his First, Eighth, and Fourteenth Amendment rights by failing to protect him from being shanked at Wisconsin Secure Program Facility (WSPF), by immediately shunting him to the Green Bay Correctional Institution (GBCI), and by failing adequately to treat his physical and mental health issues at GBCI. The parties have consented to magistrate judge jurisdiction, and on December 27, 2018, Lindell filed a motion requesting to proceed on his proposed amended complaint in this lawsuit. (Dkt. 17.) I am granting that motion.

I have reviewed Lindell's amended complaint as required by 28 U.S.C. § 1915A. Pursuant to Federal Rule of Civil Procedure 21, I am permitting Lindell to proceed on Eighth and First Amendment claims against some of the named defendants related to the WSPF attack and transfer, but I am severing Lindell's Eighth Amendment claims related to his treatment at GBCI . Finally, Lindell has filed a motion for assistance in recruiting counsel (dkt. 28), which I am denying without prejudice.

ALLEGATIONS OF FACT[1]

A. The Parties

Plaintiff Nate Lindell is currently incarcerated at Columbia Correctional Institution, but the events comprising his claims took place when he was incarcerated at WSPF in October of 2018. He names thirteen defendants. Cathy Jess is the Wisconsin Department of Corrections (DOC) Secretary, and Lindell is suing her in her official and individual capacities. He names five WSPF employees: Warden Gary Boughton; Security Director Mark Kartman; Unit Manager Lebbeus Brown; Correctional Officer (CO) Shawn Gallinger; and Supervisor John Doe 1. And he names six GBCI employees: Health Services Unit (HSU) Manager Jean Lutsey; Advanced Care Practitioner (ACP) Susan Peters; RN Mary H. Alsteen; ACP Leslie A. Mathewson; psychiatric provider L. Adams; and Psychological Services Unit (PSU) supervisor Todd L. Hamilton. Finally, he names John Doe 2, the individual (or individuals) responsible for transferring him to GBCI on October 9, 2018.

B. The Attack on Lindell at WSPF

While Lindell's complaint includes various allegations related to his opinion that WSPF staff mishandle prisoner safety, the time line of Lindell's allegations related to his claims in this lawsuit begin in May of 2018. At that time, WSPF implemented a revised program for prisoners on administrative confinement status, called the "PACE" program. (Pl. Ex. 2 (dkt. 18-2).) Administrative confinement at WSPF is highly restrictive. Prisoners in administrative

---

[1] In addressing any pro se litigant's complaint, the court must read the allegations generously, resolving ambiguities and drawing reasonable inference in plaintiff's favor. *Haines v. Kerner*, 404 U.S. 519, 521 (1972).

confinement can earn back privileges and re-enter the general population by proceeding through four phases that gradually increase privileges and reduce restrictions. Phase 1 is the most restrictive and Phase 4 is the least.

When WSPF first implemented the PACE program, Brown explained it to all prisoners who were on administrative confinement status. According to Lindell, one major problem with the program is that in Phase 2, prisoners may attend group recreation with one another– in fact, Lindell alleges they *must* attend group recreation in order to advance to Phase 3–but they must remain shackled until they reach Phase 4. Lindell alleges that this created an environment that allowed dozens of fights, assaults, and stabbings to occur during group activities, since correctional officers are not physically present in the recreation rooms. Lindell claims that when Brown explained the phases, he acknowledged that there would be more fights as a results of this phasing order, but the decision had been made to allow prisoners to get the fighting "out of their system" before reaching Phase 4.

At some point after implementation of the PACE program, Lindell wrote a letter to Warden Boughton expressing concern with the recreation provisions of the PACE program. Boughton responded that the dangers Lindell described are typical in "nearly any environment," and that developing interpersonal skills is a necessary step toward transition into general population. (Pl. Ex. 3 (dkt. 18-3).) Boughton added that Lindell was not required to participate in leisure time activities, and that if he perceived a threat, he could submit a DOC-1803, Inmate Request for Separation. It does not appear that Lindell submitted such a form.

Lindell alleges that in June 2018, WSPF staff searched all of the cells in the administrative confinement unit, recovering over thirty hand-crafted shanks. Despite these

3

seizures in June, in July a prisoner on administrative confinement status, known to have previously possessed a shank, stabbed another prisoner with a sharpened toothbrush, while they were in the outdoor recreation area.

At around this time, prisoner Jesse Keith was on administrative confinement status in Phase 2. Lindell alleges that Boughton, Brown, and Kartman knew that Keith was extremely dangerous: he had transferred into WSPF from another state's institutional system, he had founded a white supremacist gang, and he was believed to have committed at least one murder while in prison. Even so, Keith was treated like any other prisoner on administrative confinement status and thus presumably proceeded through the PACE program. On or around October 6, 2018, Keith told another prisoner, Terrance Prude, that he wanted to kill Lindell; according to Lindell, CO Gallinger heard their conversation. At around this time, Gallinger also heard Keith carving a knife from a piece of steel, but he did nothing to protect Lindell. Lindell claims that he and Gallinger have a history of animosity: in 2013 Lindell allegedly threw body waste at Gallinger, and in 2018 Gallinger hampered Lindell's progress through the PACE program by describing his conduct as "picky."

On October 8, 2018, Gallinger was training another CO on how to do pat searches, and they escorted Keith to a group indoor recreation room, where Lindell was located. Apparently Gallinger failed to detect a 15-inch blade inside Keith's waste band. After Gallinger and his trainee left Keith and Lindell alone together, Keith stabbed Lindell three times in the head, twice in the upper left arm, in his right eye socket, in his lip, and left middle finger. As a result, Lindell had 31 staples and internal sutures placed in his scalp, undergoing significant blood loss in the

process. Due to the attack, Lindell alleges that his already-existing mental health problems worsened.

### C. Transfer to GBCI and Subsequent Treatment

On October 9, 2018, while Lindell was at the hospital, a sergeant told Lindell that he was being sent to GBCI because WSPF's administration knew that Lindell was going to file a lawsuit related to the attack and they didn't want to deal with it. Lindell was taken directly to GBCI from the hospital. Lindell claims that there was no reason to transfer him because Keith had been taken out of physical contact with all prisoners.

When Lindell arrived at GBCI, Captain Van Lanen met with Lindell and mentioned that he knew that Lindell filed a lot of lawsuits. Within days of Lindell's arrival at GBCI, an inmate committed suicide in GBCI's restrictive housing unit. Lindell claims that suicide attempts and self-mutilation are so common at GBCI that Van Lanen told Lindell that prisoners were not allowed access to pens. Lindell believes that John Doe 2, the individual responsible for his transfer, was aware that GBCI had been experiencing an increase in instances of self-harm and suicide attempts when deciding to transfer him.

Upon his arrival at GBCI, Lindell did not receive adequate medical or mental health care. He was suffering from severe pain in his scalp, right shoulder, and wrist, along with headaches, migraines, dizziness and nausea. Even though the hospital had prescribed Toradol for Lindell's pain, RN Alsteen refused to provide it to him on October 9, and ACP Peters withheld it from Lindell on October 10. Neither of these defendants provided Lindell with an effective substitute to alleviate his pain. On October 10, ACP Peters cancelled Lindell's prescriptions for Excedrin-migraine, and Vitamin D, which Lindell had been taking for over three years. Peters also failed to order x-rays of Lindell's left wrist and shoulder for over a month, and Peters refused to

5

examine Lindell's left wrist, right shoulder, and scalp during an examination that took place on October 23, 2018.

According to Lindell, these treatment failures persisted, but Lutsey refused to address them. Specifically, Lindell submitted a Health Services Request (HSR) on November 7, 2018, to Lutsey directly, complaining that he had met with a nurse who refused to examine his injuries. (Pl. Ex. 5 (dkt. 18-5, at 1).) The next day, Lutsey responded that she should schedule an appointment for him to be seen. (*Id.*) On November 22, 2018, Lindell submitted another HSR to Lutsey, this time complaining that his liquid medication restriction prevented him from receiving Excedrin and Vitamin D. RN Alsteen responded that Lindell's history of medical misuse warranted the restriction, and he was receiving all medication deemed necessary. On November 30, Lutsey signed off on Alsteen's response. (Pl. Ex. 6 (dkt. 18-5, at 2).)

Finally, Lindell claims that staff at GBCI did not address his mental health needs. On October 10, 2018, ACP Mathewson cancelled Lindell's anti-depressant (bupropion) and sleep aid (hydroxizine), both of which Lindell had been taking by prescription for three years. The combination of Lindell's recent assault and the cessation of his medications caused him to feel depressed. Lindell submitted two Psychological Service Requests (PSRs), requesting to be evaluated. (Pl. Ex. 7, 8 (dkt. 18-6).) Specifically, on October 18, 2018, Lindell wrote that he had been crying, felt like he "could break," and was "desperate" from sadness and hopelessness. Hamilton responded on October 22 that PSU staff had visited him at his cell. In an October 22, 2018, PSR, Lindell requested to be evaluated and expressed concern about the isolating conditions he was enduring, and on October 25, 2018, Adams responded that staff were monitoring him. On October 24, Mathewson met with Lindell, but when Lindell asked for their

conversation to be recorded, Mathewson stormed out of the room. On October 29, 2018, Lindell became so depressed that he tried to hang himself and cut his wrists.

OPINION

Lindell seeks leave to proceed on Eighth, First, and Fourteenth Amendment claims. I will address each type of claim in turn, but as a starting point, I am dismissing Jess as a defendant. Lindell has not alleged that Jess was personally involved in any of the events comprising his claims, and Lindell may not proceed against her on a claim of vicarious liability. *See Palmer v. Marion Cty.*, 327 F.3d 588, 594 (7th Cir. 2003); *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000) ("[Section] 1983 does not allow actions against individuals merely for their supervisory role of others."). Lindell's current incarceration at CCI makes it unnecessary to retain Jess as a defendant in her official capacity because Lindell's claims are based on what happened at WSPF and GBCI.

I. **Eighth Amendment Deliberate Indifference Related to Assault**

Lindell seeks leave to proceed on Eighth Amendment deliberate indifference claims against Boughton, Brown, Kartman, John Doe 1, and Gallinger related to his assault. To state an Eighth Amendment failure-to-protect claim, a prisoner must allege that: (1) he faced a "substantial risk of serious harm" and (2) the prison officials identified acted with "deliberate indifference" to that risk. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005).

7

Lindell's allegations related to Gallinger permit an inference of deliberate indifference. Gallinger allegedly knew that Keith wanted to attack Lindell, but Gallinger either failed to search Keith adequately or turned a blind eye to the fact that Keith was armed with a shank when Keith entered the recreation room with Lindell. Lindell further alleges that Gallinger had a motive to allow Lindell to be harmed. These allegations support a reasonable inference that Gallinger acted with deliberate indifference to the risk of substantial harm that Lindell faced from Keith.

Boughton, Brown, Kartman, and John Doe 1 are closer calls, but Lindell may proceed against them. Weighing against granting leave is the notion that "[c]omplaints that convey only a generalized, vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger." *Gevas v. McLaughlin*, 798, F.3d 475, 480-81 (7th Cir. 2015). In *Grieveson v. Anderson*, the Seventh Circuit affirmed the dismissal of a failure to protect claim in which the prisoner "told jail officials only that he was afraid and that he wanted to be moved." 538 F.3d 763, 776 (7th Cir. 2008). Similarly, in *Olson v. Morgan*, the court affirmed dismissal of a claim in which the plaintiff expressed his fear of his cell mate and requested a different cell. 750 F.3d 708, 713 (7th Cir. 2014).

Lindell may not have reported the danger posed by Keith specifically, but Lindell's allegations permit a reasonable inference that in October of 2018, these defendants were aware that the PACE program suffered from deficiencies in practice. At the screening stage, the court may reasonably infer that Boughton, Brown, Kartman and John Doe 1 had not adequately responded to their knowledge that (1) prisoners on administrative confinement status were able to obtain weapons despite the June 2018 sweep,(2) serious assaults between prisoners on

administrative confinement status had occurred in the recreation rooms, and (3) Keith was uniquely dangerous. Likewise, at the screening stage, it is reasonable to infer that Boughton, as warden, and Kartman, as security director, were aware of these specific issues but failed to correct them. At the screening stage, Keith's attack on Lindell could be viewed as a product of these deficiencies, since Keith attacked him during a recreation period that allegedly was unsupervised by any WSPF staff. Accordingly, Lindell may proceed on a deliberate indifference claim against Boughton and Kartman.

For similar reasons, Lindell's allegations about Brown and John Doe 1 suffice to allow an Eighth Amendment claim to proceed. Lindell alleges that as of May 2018, Brown knew that the aspects of the PACE program would increase the number of assaults, and it is reasonable to infer that Brown, as unit manager, and Doe 1, as a supervisor, had been apprised of the June 2018 recovery of dozens of weapons from prisoners on administrative confinement status, as well as the prisoner-on-prisoner attacks. While there is no indication in Lindell's complaint that Brown or Doe 1 had the authority to modify the PACE program, they were at least in a position to flag those features of the program that were exposing prisoners to the risk of serious harm. At the leave to proceed stage, their alleged failure to take any steps to temper the safety risks posed by the PACE program could support a reasonable inference of deliberate indifference to Lindell's safety.

II.     **First Amendment**

Lindell seeks to proceed on a First Amendment retaliation claim against John Doe 2, for the decision to transfer him to GBCI. To state a retaliation claim, a plaintiff must allege three

9

things: (1) he was engaging in activity protected by the Constitution; (2) the defendant's conduct was sufficiently adverse to deter a person of "ordinary firmness" from engaging in the protected activity in the future; and (3) the defendant subjected the plaintiff to adverse treatment because of the plaintiff's constitutionally protected activity. *Gomez v. Randle*, 680 F.3d 859, 866-67 (7th Cir. 2012); *Bridges v. Gilbert*, 557 F.3d 541, 555-56 (7th Cir. 2009). While I am highly skeptical that this claim has traction, Lindell's allegations pass muster under the generous standard that the court must apply at screening.

First, Lindell has pled sufficient facts to permit an inference that he was transferred to GBCI because of his prior lawsuits and his perceived intent to file a lawsuit related to Keith's attack. Whether the transfer itself was sufficiently adverse is a closer call: would a transfer from an institution whose policies allow prisoner-on-prisoner violence to an institution in which suicide and self-harm occur deter a reasonable prisoner from filing a lawsuit? Probably not, but I will accept that Lindell's transfer to GBCI amounted to something harsher than the type of inconveniences that have been held insufficient to discourage protected speech. *See Long v. Hammer*, 727 F. App'x 215, 217 (7th Cir. 2018) (yelling, charging copying fees, and requiring prisoner to sign up for library time would not chill protected conduct).

As for the third element, it is unclear whether Doe 2 actually chose to transfer Lindell *to GBCI*, or if the decision was to transfer Lindell *out of WSPF*. It is likewise unclear whether Doe 2 had reason to know that Lindell would be placed in the restrictive housing unit at GBCI. That said, Lindell has alleged that between 2017 and 2018, there had been a significant increase in lawsuits and instances of self-harm and suicide at GBCI, and Lindell does assert that it is "probable" that Doe 2 knew about these conditions when deciding to transfer him. Accordingly, construing Lindell's allegations generously, it would not be unreasonable to infer that Doe 2's

10

transfer decision may have intended to subject Lindell to the conditions at GBCI to punish him for his prior litigiousness. I expect that discovery on this claim will change the narrative significantly, but I will allow Lindell to proceed past screening so that he may conduct discovery as to who actually transferred him and the reasons for that transfer.

Beyond identifying who actually was responsible for transferring Lindell, going forward Lindell will need to come forward with evidence showing that Doe 2 was responsible for his placement at GBCI in particular. *Minix v. Canarecci*, 597 F.3d 824, 833-34 (7th Cir. 2010) ("[I]ndividual liability under § 1983 requires personal involvement in the alleged constitutional deprivation.") (internal quotation omitted). Further, Lindell will not be able to prove his claim with the allegations in his complaint, *Sparing v. Village of Olympia Fields*, 266 F.3d 684, 692 (7th Cir. 2001), or his personal beliefs, *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007). Rather, Lindell will have to come forward with specific evidence either at summary judgment or at trial that Doe 2 transferred him to punish him for being so litigious previously, and Lindell may also need to rebut evidence that he would have been transferred to GBCI regardless of his litigation history.

### III. Fourteenth Amendment

#### A. Due Process Clause

Lindell also seeks to proceed on a claim under the Fourteenth Amendment for violation of his right to due process. To proceed on a claim challenging the process afforded in a prison disciplinary proceeding, a plaintiff must allege that: (1) he has a liberty or property interest with which the state interfered; and (2) the procedures he was afforded upon that interference were constitutionally deficient. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989); *Marion v.*

*Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009); *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007).

In the transfer context, prisoners have a liberty interest when they are transferred to a supermax-style facility whose conditions would impose "atypical and significant hardship in relation to the ordinary incidents of prison life." *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005). Otherwise, prisoners have no liberty interest related to a transfer "from one institution to another within the state prison system." *Meachum v. Fano*, 427 U.S. 215, 225 (1976). The Court of Appeals for the Seventh Circuit has held that "transfers from one prison to another with a more adverse condition of confinement do not affect a recognized liberty interest." *Meisberger v. Cotton*, 181 F. App'x 599, 600 (7th Cir. 2006); *see also King v. Fairman*, 997 F.2d 259, 262 n.4 (7th Cir. 1993) ("an inmate has no liberty interest in confinement at any particular state prison" and that "prison officials may effect discretionary transfers of an inmate without implicating the due process clause").

GBCI is not a supermax facility, while WSPF is the most secure institution in the state. While Lindell may have separate constitutional claims related to his treatment at GBCI, he has failed to allege facts that implicate a liberty interest. Accordingly, Lindell may not proceed on a due process claim related to his transfer to GBCI.

### B. Equal Protection

Finally, Lindell seeks to proceed against John Doe 2 on a claim under the equal protection clause, on the theory that he was singled out and transferred as a punishment. To establish a prima facie case of discrimination under the equal protection clause, a plaintiff is

12

required to show that he: (1) "is a member of a protected class"; (2) "is otherwise similarly situated to members of the unprotected class"; and (3) "was treated differently from members of the unprotected class." *Brown v Budz*, 398 F.3d 904, 916 (7th Cir. 2005) (quoting *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir. 1993)). Absent membership in a protected class, a plaintiff may state a claim under the equal protection clause on a "class of one" theory by pleading that he was treated differently from other prisoners without any rational basis. *Flynn v. Thatcher*, 819 F.3d 990, 991 (7th Cir. 2016) ("Prison classifications are presumed to be rational and will be upheld if any justification for them can be conceived."); *May v. Sheahan*, 226 F.3d 876, 882 (7th Cir. 2000) ("In the prison context, the Equal Protection Clause of the Fourteenth Amendment requires inmates to be treated equally, unless unequal treatment bears a rational relation to a legitimate penal interest."). In order to state such a claim, however, plaintiff "must allege facts sufficient to overcome the presumption of rationality that applies to government classifications." *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 639 (7th Cir. 2007).

To start, Lindell has not alleged that he is a member of a protected class, so the question is whether he has alleged facts that give rise to a reasonable inference that he was transferred to GBCI without any rational basis. He has not. Indeed, Lindell was transferred out of WSPF after being attacked by another inmate. While Lindell alleges that he could have remained at WSPF because Keith no longer has access to any other prisoners, his allegations do not permit a reasonable inference that the transfer lacked *any* legitimate justification. Indeed, it is both conceivable and logical to move a prisoner in Lindell's circumstances to another institution to

avoid another possible attack in the future. Accordingly, I am denying Lindell leave to proceed on a class of one equal protection claim.

IV.     **Deliberate Indifference Related to Medical and Mental Health Care at GBCI**

Finally, Lindell seeks leave to proceed on claims that defendants John Doe 2, Lutsey, Peters, Alsteen Mathewson, Hamilton, and Adams acted with deliberate indifference to his serious medical and mental health needs. Lindell has a Rule 21 joinder problem.

Federal Rule of Civil Procedure 20 prohibits a plaintiff from asserting unrelated claims against different defendants or sets of defendants in the same lawsuit. Multiple defendants may not be joined in a single action unless the plaintiff asserts at least one claim for relief against each defendant that arises out of the same transaction or occurrence or series of transactions or occurrences and presents questions of law or fact common to all. *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007). A plaintiff may usually also bring unrelated claims together in a lawsuit as long as they are against the same defendant. *See* Fed. R. Civ. P. 18. Even though a complaint may satisfy Rules 18 and 20, Federal Rule of Civil Procedure 21 affords district courts discretion to sever a lawsuit when it would be unwieldy to allow a plaintiff to maintain claims against different groups of defendants in a single case. *Lee v. Cook County, Ill.*, 635 F.3d 969, 971 (7th Cir. 2011) (court may sever claims under Federal Rule of Civil Procedure 21 when differences between the claims predominate over common questions); *In re High Fructose Corn Syrup Antitrust Litigation*, 361 F.3d 439, 441 (7th Cir. 2004) (court has inherent authority to sever claims in the interest of justice even when

the standard under Rule 21 is not satisfied). The Court of Appeals for the Seventh Circuit has stated, "[a] litigant cannot throw all of his grievances, against dozens of different parties, into one stewpot." *Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680, 683 (7th Cir. 2012).

I infer that Lindell's position is that his assault, transfer and subsequent treatment are all chapters in an integrated narrative that satisfies Rule 20. I see it differently. There is a clear distinction between the events and the defendants involved in the assault at WSPF, and the events and the defendants involved in Lindell's subsequent care and treatment at GBCI. Moreover, the legal standard applicable to Lindell's failure-to-protect claim against the WSPF defendants differs from the deliberate indifference standard related to his mental health and medical care claims at GBCI. If I permitted both sets of claims to go forward in one lawsuit, they would proceed on two nonintersecting tracks, one for the WSPF defendants and the other for the GBCI defendants. The bottom line is that there is are factual and legal breaks between the WSPF and the GBCI claims.

Since the predominant theme of Lindell's complaint focuses on seeking redress for his severe assault and allegedly retaliatory transfer, I will allow him to proceed on those claims in this lawsuit and will sever Lindell's claims against the GBCI defendants, comprised of paragraphs 56-65 of his amended complaint (*see* dkt. 18, at 14-16), into a separate lawsuit. Severance of those claims into a new lawsuit requires a new filing fee. Therefore, the next step in that lawsuit will be for Lindell to determine whether he will pay the $400 filing fee, seek leave to proceed *in forma pauperis*, or voluntarily dismiss those claims without prejudice. If he chooses to go forward with that lawsuit, I will screen those claims as

15

required by 28 U.S.C. § 1915A.

V.      **Motion for Assistance in Recruiting Counsel (dkt. 28)**

I am denying Lindell's motion for assistance in recruiting counsel without prejudice. A pro se litigant does not have a right to court-appointed counsel in a civil case like this one, *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014), but a district court has discretion to assist pro se litigants find a lawyer to represent them. *Pruitt v. Mote*, 503 F.3d 647, 649 (7th Cir. 2007). A party who wants assistance from the court in recruiting counsel must meet several requirements. *Santiago v. Walls*, 599 F.3d 749, 760-61 (7th Cir. 2010). First, he must show that he is unable to afford to hire his own lawyer. 28 U.S.C. § 1915(e)(1) ("The court may request an attorney to represent any person unable to afford counsel."). Second, he must show that he has made reasonable efforts on his own to find a lawyer to represent him. *Jackson v. County of McLean*, 953 F.2d 1070 (7th Cir. 1992). Finally, he must show that the legal and factual difficulty of the case exceeds his ability to prosecute it. *Pruitt*, 503 F.3d at 654-55.

Lindell has met the first two requirements: he is indigent, and has submitted attorney rejection letters. Lindell has not met the third requirement. In support of his motion, Lindell claims that this case is too complex for him to proceed without an attorney, that he has been denied access to a pen and only has access to a rubber pencil, that he has been denied access to attorney information and documents relevant to his claims, that he was transferred to CCI to thwart his ability to litigate this case, and that the resolution of this case may affect other prisoners. None of these justifications warrants recruitment of counsel at that time.

Lindell is an experienced pro se litigator, having filed 19 lawsuits in this court, starting

16

with 01-cv-209-bbc. My cursory review quickly uncovered four jury trials in this court (02-cv-459, 02-cv-473, 05-cv-04 and 06-608) at which Lindell had represented himself. For almost two decades, Lindell has demonstrated the ability to express himself clearly, to marshal relevant facts, to research the applicable law, and to present sufficiently cogent arguments. This court gets about 300 new pro se lawsuits every calendar year, the vast majority filed by inmates incarcerated by the DOC. Within this group, if Lindell isn't the pro se prisoner *least* in need of a volunteer attorney from this court, he's in the top ten.

Lindell counters that he only has access to a rubber pencil and that CCI staff want to prevent him from litigating this case. These claims won't get him an attorney. Lindell's filings continue to be readable, so I am not concerned that the writing implement provided to him is insufficient. Further, as Lindell well knows, while CCI staff may have done little to cooperate with him up to this point, the equation changes once this court grants him leave to proceed. Lindell will be dealing with whichever AAG is assigned to this lawsuit, and that attorney will ensure that the State meets its obligations to Lindell as set forth in the federal rules and this court's procedures. The bottom line: Lindell does not need a volunteer attorney at this point in the lawsuit.

ORDER

IT IS ORDERED that:

1) Plaintiff Nate Lindell's motion to amend his complaint (dkt. 17) is GRANTED.

2) Plaintiff is GRANTED leave to proceed on:

   a) Eighth Amendment claims against Boughton, Brown, Gallinger, Kartman and John Doe 1, related to Lindell's assault at WSPF.

   b) A First Amendment retaliation claim against defendant John Doe 2, related to Lindell's transfer to WSPF.

3) Lindell's allegations in paragraphs 56-65 of his amended complaint (dkt. #18) are SEVERED into a new lawsuit related to his claims against defendants Lutsey, Peters, Alsteen, Mathewson, Adams, and Hamilton.

4) Pursuant to an informal service agreement between the Wisconsin Department of Justice and this court, copies of plaintiff's complaint and this order are being sent today to the Attorney General for service on the defendants. Under the agreement, the Department of Justice will have 60 days from the date of the Notice of Electronic Filing of this order to answer or otherwise plead to plaintiff's complaint if it accepts service for defendants. Summons will not issue for the Doe defendants until Lindell learns their identities and amends his complaint accordingly.

5) For the time being, plaintiff must send defendants a copy of every paper or document he files with the court. Once plaintiff has learned what lawyer will be representing defendants, he should serve the lawyer directly rather than defendants. The court will disregard any documents submitted by plaintiff unless plaintiff shows on the court's copy that he has sent a copy to defendants or to defendant's attorney.

6) Plaintiff should keep a copy of all documents for his own files. If plaintiff does not have access to a photocopy machine, he may send out identical handwritten or typed copies of his documents.

7) Plaintiff's motion for assistance in recruiting counsel (dkt. 28) is DENIED without prejudice.

Entered this 12th day of June, 2019.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge